DECISION
{¶ 1} Relator, Autumn Health Care of Coshocton, Inc. ("Autumn"), commenced this original action requesting that this court issue a writ of mandamus ordering respondent, Ohio Department of Job and Family Services ("ODJFS"), to set Autumn's per diem Medicaid reimbursement rate for "fiscal year 2006" (July 1, 2005 through June 30, 2006) at $145.72. *Page 2 
 {¶ 2} This court referred the matter to a magistrate of this court, pursuant to Civ.R. 53 and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) Therein, the magistrate recommended that this court deny relator's request for a writ of mandamus. Relator filed objections to the magistrate's decision, and, therefore, this matter is now before this court for a full, independent review.
 {¶ 3} Relator has filed three objections to the magistrate's decision, which are as follows:
 1. The Magistrate erred in denying the writ on the basis that H.B. 66 was passed for the purpose of Medicaid reform and because of changes the federal government was making in determining how costs should be determined.
 2. The Magistrate erred in denying the writ on the basis that R.C. 5111.03 "may apply in this case."
 3. The Magistrate erred in denying the writ on the basis that R.C. 5111.222 permits the adjustments ODJFS purported to make.
 {¶ 4} By its first objection, relator argues that the magistrate erred in basing her decision on what she perceived as a reason for the passage of Am. Sub. H.B. No. 66. Additionally, relator asserts that the magistrate based her decision on evidence outside the record because she opined on the General Assembly's purpose in passing Am. Sub. H.B. No. 66. To the contrary, we see no error in the magistrate making a general observation based on a review of changes in Medicaid law. Moreover, the magistrate's observation regarding one of the reasons for the passage of Am. Sub. H.B. No. 66 is not ultimately determinative of the issue of whether a writ would be appropriate in this case. *Page 3 
 {¶ 5} Relator argues in its second objection to the magistrate's decision that the magistrate erred in denying the writ on the basis that R.C. 5111.03 "may apply in this case." In her decision, the magistrate noted that it is conceivable that the provisions of R.C. 5111.03, which concern excess payments to a provider resulting from deception, "may apply in this case." But the magistrate did not make any determination as to whether those provisions actually apply. Thus, her observation should not be interpreted as a basis for her recommendation that the writ should be denied. Furthermore, to the extent her decision is interpreted to be based, at least in part, on the observation that R.C.5111.03 "may apply in this case," we clarify that relator is not entitled to the requested writ notwithstanding the possible applicability of R.C. 5111.03 to the facts of this case.
 {¶ 6} Relator argues by its third objection that the magistrate erred in recommending the denial of the writ on the basis that "R.C. 5111.222" permits the adjustments that ODJFS purported to make in this case. According to relator, although R.C. 5111.222 permits ODJFS to adjust reimbursement rates if the facility is overpaid, Am. Sub. H.B. No. 66 specifically prohibits such adjustments for fiscal year 2006. Thus, pursuant to relator's reasoning, the magistrate's reliance upon R.C.5111.222 was erroneous. In a footnote in her decision, the magistrate observed that relator's argument for why it was entitled to the higher rate of reimbursement does not consider the language concerning overpayment in "R.C. 5111.222." Although the magistrate's decision refers to R.C. 5111.222, she clearly was referring to R.C. 5111.221, which provides in part that if the rate paid to a provider for a facility is higher than the rate calculated for it for the current fiscal year, the provider is required to refund to the department the difference *Page 4 
between the two rates for the number of days for which the facility was paid. Like other issues raised by relator's objections, the magistrate's tangential reference to R.C. 5111.221 was not central to her analysis of why relator is not entitled to the requested writ.
 {¶ 7} In this mandamus action, relator argues that it has a clear legal right to a Medicaid reimbursement rate of $145.72 per patient, per day, for fiscal year 2006. Relator's argument hinges on its interpretation of Am. Sub. H.B. No. 66. In pertinent part, Am. Sub. H.B. No. 66 provides:
 (B) Except as otherwise provided in this section, the provider of a nursing facility that has a valid Medicaid provider agreement on June 30, 2005, and a valid Medicaid provider agreement for fiscal year 2006 shall be paid, for nursing facility services the nursing facility provides during fiscal year 2006, the sum of the following:
 (1) The rate the provider is paid for nursing facility services the nursing facility provides on June 30, 2005;
 (2) Unless the nursing facility is exempt from paying the franchise permit fee, one dollar and ninety-five cents.
 * * *
 (H) The Department of Job and Family Services shall follow this section in determining the rate to be paid to the provider of a nursing facility under the Medicaid program for nursing facility services provided during fiscal year 2006 notwithstanding anything to the contrary in sections 5111.20 to 5111.33 of the Revised Code.
 {¶ 8} Relator was a new nursing facility Medicaid provider in June 2004. Pursuant to R.C. 5111.255, relator's initial rate of Medicaid reimbursement was $145.72 per patient, per day. Pursuant to R.C.5111.26(A)(1)(b), relator was required to submit a cost report by December 2004, which was 90 days after the end of its first three calendar *Page 5 
months of operation. That cost report was to be used to determine the rate which relator was entitled to receive beginning April 1, 2005. See R.C. 5111.255. Am. Sub. H.B. 66 was passed by the legislature with an effective date of June 30, 2005. The cost report was not submitted until July 2005.
 {¶ 9} Upon reviewing the facts of this case and applicable law, the magistrate disagreed with relator's argument that it has a clear legal right to a reimbursement rate of $145.72 per patient, per day, for fiscal year 2006. The magistrate found it "inconceivable" for relator to expect that it should be paid approximately $486,000 more than it would have been paid due to its failure to follow the law and provide ODJFS with information needed to determine what relator's actual rate of reimbursement, effective April 1, 2005, should have been.
 {¶ 10} Consistent with the magistrate's analysis, we find that relator is seeking to benefit from its own noncompliance with the law by attempting to use Am. Sub. H.B. No. 66 as support for its argument that it has a clear legal right to continue to be paid the initial rate of $145.72 per patient, per day. Am. Sub. H.B. No. 66 provides that a nursing facility that meets certain requirements shall be paid "the rate the provider is paid for nursing facility services the nursing facility provides on June 30, 2005," in addition to $1.95, if it is not exempt from paying the franchise permit fee. Here, the dispute centers around the rate the provider, relator, was paid for services provided on June 30, 2005, for purposes of Am. Sub. H.B. No. 66. Relator asserts that its reimbursement rate for fiscal year 2006 should have been the per diem rate it was paid for nursing facility services it provided on June 30, 2005, which was $143.77, plus the $1.95, for a total reimbursement rate of $145.72 per patient, per day. Thus, relator argues in this mandamus action that *Page 6 
pursuant to the plain language of Am. Sub. H.B. No. 66, it has a clear legal right to continue to be paid the rate of $145.72 per patient, per day, for fiscal year 2006.
 {¶ 11} Relator's "plain language" argument is unpersuasive. " `[W]hen the statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms.' " State ex rel. Asti v. Ohio Dept.of Youth Servs., 107 Ohio St.3d 262, 2005-Ohio-6432, at ¶ 33, quotingLamie v. United States Trustee (2004), 540 U.S. 526, 534,124 S.Ct. 1023, quoting Hartford Underwriters Ins. Co. v. Union Planters Bank,N.A. (2000), 530 U.S. 1, 6, 120 S.Ct. 1942. "It is well-settled that statutes should not be construed to yield an unreasonable or absurd result." Matthews v. D'Amore, Franklin App. No. 05AP-1318,2006-Ohio-5745, at ¶ 35, citing Delahoussaye v. Ohio State RacingComm., Franklin App. No. 03AP-954, 2004-Ohio-3388, at ¶ 14.
 {¶ 12} In the case at bar, adopting relator's interpretation of Am. Sub. H.B. No. 66 would create an absurd result in this matter because it would produce an unjustified windfall for relator as a direct result of its failure to timely file a cost report, which would have provided the necessary information to ODJFS for it to determine relator's correct rate of reimbursement for a period that would include June 30, 2005. In view of this potential absurdity, we resolve that Am. Sub. H.B. No. 66 cannot be interpreted to provide that relator shall be paid, in fiscal year 2006, the rate relator was paid for services provided on June 30, 2005, plus the $1.95, even though that rate was inflated as a direct result of relator's failure to comply with the law. Had relator followed the law, the correct rate could have been determined in the first instance. Therefore, we conclude that relator *Page 7 
has not demonstrated a clear legal right to a reimbursement rate of $145.72 per patient, per day, for fiscal year 2006.
 {¶ 13} Following our independent review of this matter, we find that the magistrate properly discerned the pertinent facts and applied the relevant law to those facts. Thus, we overrule relator's objections and adopt the magistrate's decision as our own, including the magistrate's findings of fact and conclusions of law, as amplified herein.[1] In accordance with the magistrate's decision, we deny relator's request for a writ of mandamus.
Objections overruled; writ denied.
BRYANT and KLATT, JJ., concur.
[1] We also correct the typographical error in footnote 4 of the magistrate's decision. The reference to R.C. 5111.222 is replaced with a reference to R.C. 5111.221. *Page 8 
 MAGISTRATE'S DECISION {¶ 14} Relator, Autumn Health Care of Coshocton, Inc. ("Autumn"), has filed this original action requesting that this court issue a writ of mandamus ordering respondent, Ohio Department of Job and Family Services ("ODJFS"), to set Autumn's per diem Medicaid reimbursement rate for fiscal year 2006 at $145.72. *Page 9 
Findings of Fact: {¶ 15} 1. Autumn is a state-licensed, 74-bed, long-term care nursing facility ("NF") located in Coshocton, Ohio.
 {¶ 16} 2. Autumn was a new NF Medicaid provider in June 2004.
 {¶ 17} 3. As a Medicaid provider, Autumn was entitled to be partially funded by the Federal Medicaid Program, which is administered by ODJFS. All NF Medicaid providers are paid a per diem, per patient reimbursement rate, which is based upon a number of factors. (See R.C. 5111.21 and5111.23.)
 {¶ 18} 4. All NF Medicaid providers are required by law to file cost reports which are then utilized by ODJFS to determine the rate at which the NF will be reimbursed. (See R.C. 5111.231.)
 {¶ 19} 5. As a new NF Medicaid provider, Autumn's initial rate of reimbursement was determined pursuant to R.C. 5111.255.
 {¶ 20} 6. Essentially, a new NF is reimbursed at a rate which represents the median rate at which other established NFs are being reimbursed in the relevant peer group.
 {¶ 21} 7. Autumn's initial reimbursement rate was set at $143.77 per patient, per day, plus an additional $1.95 per patient, per day. The total initial rate paid to Autumn was $145.72.
 {¶ 22} 8. Pursuant to R.C. 5111.26, Autumn was required to file its first cost report covering the time period from June 25 through September 30, 2004, by December 2004. *Page 10 
 {¶ 23} 9. That cost report, which Autumn was required to file by December 2004, would have been used by ODJFS to determine Autumn's actual rate of Medicaid reimbursement effective April 1, 2005. (See R.C.5111.255.)
 {¶ 24} 10. Autumn failed to timely file its cost report in December 2004.
 {¶ 25} 11. By letter dated February 28, 2005, ODJFS officially notified Autumn that ODJFS had not received Autumn's cost report which had been due December 2004. ODJFS further advised Autumn that it was subject to a late filing penalty of $2 plus inflation rate per Medicaid inpatient day. ODJFS also advised Autumn that, if the cost report was not received by March 31, 2005, ODJFS would initiate proceedings to terminate Autumn's Medicaid provider agreement. (See R.C. 5111.26; Stip. 186.)
 {¶ 26} 12. Autumn did not file its cost report by March 31, 2005.
 {¶ 27} 13. By letter dated May 10, 2005, ODJFS notified Autumn that, pursuant to its authority under Chapter 119 and Sections 5111.06 through5111.26 of the Revised Code and Ohio Adm. Code 5101:3-3-20, ODJFS was initiating proceedings to terminate Autumn's Medicaid provider agreement within 30 days because of Autumn's failure to file its three month cost report for the period June 25 through September 30, 2004. Autumn was informed of its right to appeal the proposed decision to terminate its Medicaid provider agreement by requesting a hearing within 30 days. (Stip. 189, which is mismarked as 199.)
 {¶ 28} 14. By letter dated June 6, 2005, counsel for Autumn notified ODJFS that it was requesting an administrative hearing regarding ODJFS's proposed decision to terminate Autumn's Medicaid provider agreement. *Page 11 
 {¶ 29} 15. By letter dated June 20, 2005, ODJFS notified counsel for Autumn that a prehearing conference was scheduled for June 27, 2005.
 {¶ 30} 16. By journal entry dated June 27, 2005, the hearing examiner set forth the rules to be followed in discovery, as well as the relevant time frame for such, and set the matter for hearing on the merits beginning August 18, 2005.
 {¶ 31} 17. In July 2005, Autumn filed its initial cost report, which had been due December 2004, with ODJFS.
 {¶ 32} 18. By letter dated July 18, 2005, ODJFS notified Autumn that, because ODJFS had received Autumn's cost report on July 13, 2005, ODJFS was rescinding its proposal to terminate Autumn's Medicaid provider agreement.
 {¶ 33} 19. By letter dated July 20, 2005, ODJFS notified Autumn that, pursuant to Autumn's actual costs as provided in the cost report Autumn submitted in July 2005, effective April 1, 2005, Autumn's Medicaid reimbursement rate would be $127.73 (plus $1.95).
 {¶ 34} 20. On the Summary of Per Diem Rates generated July 26, 2005, after ODJFS received Autumn's cost report, it is noted that Autumn's "Total Rate — FY 2006" is "$129.68."
 {¶ 35} 21. By letter dated August 10, 2005, counsel for Autumn responded to ODJFS's July 20, 2005 letter, in pertinent part:
 * * * It is my position that Amended Substitute House Bill No. 66, effective July 1, 2005, controls the situation. This legislation states, in part:
 (B) Except as otherwise provided in this section, the provider of a nursing facility that has a valid Medicaid provider agreement on June 30, 2005, and a valid Medicaid provider agreement for fiscal year 2006 shall be paid, for nursing *Page 12 
facility services and a nursing facility provides during fiscal year 2006, the sum of the following:
 (1) The rate the provider is paid for nursing facility services the nursing facility provides on June 30, 2005;. . . .
 * * * I respectfully submit the statute supersedes the administrative rule. See, for example, Ohio Revised Code § 1.52. Consequently, I respectfully request the Ohio Department of Job and Family Services to reinstate the Medicaid rate which Coshocton was paid on June 30, 2005.
 {¶ 36} 22. ODJFS refused to reset Autumn's Medicaid reimbursement rate to the initial rate of $145.72 per patient, per day, which Autumn had received when it first began operations. ODJFS asserted that Autumn was only entitled to $129.68 per patient, per day — the actual amount which Autumn was due pursuant to the cost report which Autumn failed to file until July 2005.
 {¶ 37} 23. Autumn filed the instant mandamus action in this court requesting that this court issue a writ of mandamus ordering ODJFS to continue to pay Autumn its initial rate of $145.72 because that was the rate at which ODJFS had paid Autumn on June 30, 2005. Autumn asserts that, pursuant to Am. Sub. H.B. No. 66, effective July 1, 2005, ODJFS was required to pay Autumn the rate at which Autumn had been paid on June 30, 2005.
Conclusions of Law: {¶ 38} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondent is under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law. State ex rel. Berger v. McMonagle (1983), 6 Ohio St.3d 28. *Page 13 
 {¶ 39} For the reasons that follow, it is this magistrate's decision that this court deny relator's request for a writ of mandamus.
 {¶ 40} As stated in the findings of fact, Autumn was a new state-licensed, 74-bed, long-term care NF located in Coshocton, Ohio. Autumn was a new NF Medicaid provider in June 2004. All Medicaid providers are entitled to be partially funded by the Federal Medicaid Program, which is administered by ODJFS. Because Autumn was a new NF Medicaid provider, Autumn's initial rate of Medicaid reimbursement was determined by ODJFS pursuant to R.C. 5111.255, which provides, in relevant part:
 (A) The department of job and family services shall establish initial rates for a nursing facility * * * with a first date of licensure that is on or after January 1, 1993 * * *.
 (1) The rate for direct care costs shall be determined as follows:
 (a) If there are no cost or resident assessment data as necessary to calculate a rate under section 5111.23 of the Revised Code, the rate shall be the median cost per case-mix unit calculated under division (B)(1) of that section for the relevant peer group for the calendar year preceding the fiscal year in which the rate will be paid, multiplied by the median annual average case-mix score for the peer group for that period and by the rate of inflation estimated under division (B)(5) of that section. This rate shall be recalculated to reflect the facility's actual quarterly average case-mix score * * * after it submits its first quarterly assessment information that qualifies for use in calculating a case-mix score in accordance with rules adopted under division (D) of section 5111.231 of the Revised Code.
 * * *
 (2) The rate for other protected costs shall be one hundred fifteen per cent of the median rate for the applicable type of facility calculated for the fiscal year under section 5111.235 of the Revised Code.
 (3) The rate for indirect care costs shall be the applicable maximum rate for the facility's peer group as specified in *Page 14 
division (B) of section 5111.24 or division (B) of section 5111.241 of the Revised Code.
 (4) The rate for capital costs shall be determined under section 5111.25 or 5111.251 of the Revised Code using the greater of actual inpatient days or an imputed occupancy rate of eighty per cent.
 (B) The department shall adjust the rates established under division (A) of this section at both of the following times:
 (1) Effective the first day of July, to reflect new rate calculations for all facilities under sections 5111.23 to 5111.25 and 5111.251 of the Revised Code;
 (2) Following the facility's submission of its cost report under division (A) (1 )(b) of section 5111.26 of the Revised Code.
 The department shall pay the rate adjusted based on the cost report beginning the first day of the calendar quarter that begins more than ninety days after the department receives the cost report.
 {¶ 41} Based upon the calculations described above in R.C. 5111.255, ODJFS set Autumn's initial rate of reimbursement at $145.72 per patient, per day.[2]
 {¶ 42} Autumn's first quarter ended September 30, 2004. Autumn was required to submit a cost report no later than 90 days after the end of its first three full calendar months of operation pursuant to R.C.5111.26(A)(1)(b). As such, Autumn had until the end of December 2004 to submit its cost report. As the record indicates, Autumn failed to submit its cost report timely. As noted in R.C. 5111.255, ODJFS was required to use Autumn's cost report to determine the actual rate which Autumn was entitled to receive beginning the first day of the calendar quarter that begins more than 90 days after ODJFS *Page 15 
received the cost report. As such, the new rate would have been paid effective April 1, 2005.
 {¶ 43} Because Autumn failed to timely submit its cost report in December 2004, ODJFS notified Autumn that, pursuant to Chapter 119 and Sections 5111.06 through 5111.26 of the Revised Code and Ohio Adm. Code5101:3-3-20, ODJFS was initiating proceedings to terminate Autumn's Medicaid provider agreement within 30 days. ODJFS did initiate proceedings to terminate Autumn's Medicaid provider agreement due to Autumn's failure to timely file its cost report in December 2004.
 {¶ 44} In the meantime, Am. Sub. H.B. No. 66 was passed with an effective date of June 30, 2005. The new section provides, in pertinent part:
 (B) Except as otherwise provided in this section, the provider of a nursing facility that has a valid Medicaid provider agreement on June 30, 2005, and a valid Medicaid provider agreement for fiscal year 2006 shall be paid, for nursing facility services the nursing facility provides during fiscal year 2006, the sum of the following:
 (1) The rate the provider is paid for nursing facility services the nursing facility provides on June 30, 2005;
 (2) Unless the nursing facility is exempt from paying the franchise permit fee, one dollar and ninety-five cents.
 * * *
 (H) The Department of Job and Family Services shall follow this section in determining the rate to be paid to the provider of a nursing facility under the Medicaid program for nursing facility services provided during fiscal year 2006 notwithstanding anything to the contrary in sections 5111.20 to 5111.33 of the Revised Code.[3] *Page 16 
 {¶ 45} Based upon the above-quoted language from Am. Sub. H.B. No. 66, Autumn asserts that it has a clear legal right to continue to be paid the initial rate of 145.72 per patient, per day, which it was paid when it first began operating at because that is the rate at which ODJFS paid Autumn on June 30, 2005. Autumn argues this in spite of the fact that the evidence shows that ODJFS would have paid Autumn at a rate of $129.68[4] per patient, per day, effective April 1, 2005 and including June 30, 2005, but for the fact that Autumn failed to timely file its cost report in December 2004.
 {¶ 46} In this mandamus action, relator argues that it has a clear legal right to receive approximately $485,910 per year more than it was entitled to receive but for the fact that it failed to timely file its cost report in December 2004. Relator argues this in spite of the fact that one of the reasons for the passage of Am. Sub. H.B. No. 66 was for the purpose of Medicaid reform and because of changes the federal government was making in determining how costs should be determined. This magistrate finds that it is inconceivable to imagine that Autumn expects that it should be paid approximately $486,000 more than it would have been paid due to Autumn's failure to follow the law and timely provide ODJFS with the information which Autumn was required to provide ODJFS by law and which ODJFS needed in order to determine what Autumn's actual rate of reimbursement, effective April 1, 2005, should have been.[5] *Page 17 
 {¶ 47} For all the foregoing reasons, it is this magistrate's decision that relator has not demonstrated that it has a clear legal right to continue to be paid at the initial rate of *Page 18 
$145.72 per patient, per day, when relator's actual costs, reflected in its cost report which relator failed to file in December 2004, indicate that, effective April 1, 2005, relator was only entitled to $129.68 per patient, per day. This court should deny relator's request for a writ of mandamus.
[2] Pursuant to calculations, Autumn received approximately $10,783 per day, for a total of $3,935,897 per year in Medicaid reimbursements based upon the initial rate as determined by ODJFS.
[3] Autumn had a valid Medicaid provider agreement on June 30, 2005, and a valid Medicaid provider agreement for fiscal year 2006. Furthermore, none of the exceptions otherwise provided in the section applied.
[4] According to the actual cost report data which Autumn submitted in July 2005, Autumn should have been reimbursed approximately $9,596 per day for a total of $3,502,656 per year. At the initial rate of $145.72 per patient, per day, Autumn would instead be reimbursed approximately $3,935,897 per year.
[5] Furthermore, it is conceivable that the provisions of R.C. 5111.03
may apply in this case. R.C. 5111.03 provides, in relevant part:
 Payments obtained by provider's deception; civil penalties and termina-tion of provider agreement
 (A) No provider of services * * * contracting with the department of job and family services pursuant to the medicaid program shall, by deception, obtain or attempt to obtain payments under this chapter to which the provider is not entitled pursuant to the provider agreement, or the rules of the federal government or the department of job and family services relating to the program. No provider shall willfully receive payments to which the provider is not entitled, or willfully receive payments in a greater amount than that to which the provider is entitled * * *. As used in this section, a provider engages in "deception" when the provider, acting with actual knowledge of the representation or informa-tion involved, acting in deliberate ignorance of the truth or falsity of the representation or information involved, or acting in reckless disregard of the truth or falsity of the representation or information involved, deceives another or causes another to be deceived * * * by withholding informa-tion, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another * * *. No proof of specific intent to defraud is required to show, for purposes of this section, that a provider has engaged in deception.
 (B) Any provider who violates division (A) of this section shall be liable, in addition to any other penalties provided by law, for * * * civil penalties[.]
 * * *
 (C) In addition to the civil penalties provided in division (B) of this section, the director of job and family services, upon the conviction of, or the entry of a judgment in either a criminal or civil action against, a medicaid provider or its owner, officer, authorized agent, associate, manager, or employee in an action brought pursuant to section 109.85 of the Revised Code, shall terminate the provider agreement between the department and the provider and stop reimbursement to the provider for services rendered for a period of up to five years from the date of conviction or entry of judgment. * * *
 * * *
 (F) The authority, under state and federal law, of the department of job and family services or a county department of job and family services to recover excess payments made to a provider is not limited by the availability of remedies under sections 5111.11 and 5111.12 of the Revised Code for recovering benefits paid on behalf of recipients of medical assistance.
Furthermore, this argument ignores provisions of R.C. Chapter 5111 including 5111.222 which provide that if it is determined that the rate paid to a facility is lower than the actual rate calculated for the current fiscal year, ODJFS is required to pay the facility the difference between the two rates for the number of days for which the facility was paid. Furthermore, if the actual rate paid to a facility was higher than the rate calculated for it for the current fiscal year, the facility is required to refund to the department the difference between the two rates for the number of days for which the facility was paid. Autumn was already paid approximately $486,000 for fiscal year 2005 in excess of its actual costs and seeks to be paid that amount again for fiscal year 2006. *Page 1